HARDY, Judge.
This is an action ex delicto involving claims for damages for physical injuries incurred by the allegedly wilful, malicious and unjustified action of defendant in shooting plaintiff. From a judgment rejecting his demands plaintiff has appealed.
Despite numerous citations of law by counsel for both parties, they concede that the issue presented by this appeal is purely factual in nature, with which conclusion we are in agreement.
The defense urged against plaintiff’s claim is found in Article 6 of defendant’s action which reads as follows:
“Article 6 of plaintiff’s petition is denied as written except that it is admitted that the defendant did shoot the plaintiff but respondent did so with full, just, and legal cause, in self-defense of his bodily person, and only after the plaintiff had advanced on the defendant-in an aggressive and threatening manner, after having been repeatedly warned by defendant to advance no further,, and arousing in respondent such fear of great bodily harm, that in order to protect his person and in self-defense, your respondent did shoot the plaintiff.”
The above plea on behalf of defendant places upon him the burden of establishing-the same by the necessary preponderance of the evidence.
We find the following material facts to-be established by the record before us. On the day of the shooting, July 9, 1959, plaintiff, a well developed Negro man 29 years of age, 6 feet 2 inches in height, employed as a log-truclc driver by defendant, owner and operator of the Frank Matthews Lumber Company in Mansfield, De Soto Parish, had met with an accident, which is not established as having been due to his fault,, while driving one of defendant’s trucks in the course of his employment. Another employee of defendant drove out to the scene of the accident and brought plaintiff back to defendant’s vehicle repair shop located at one of his sawmill sites in South Mansfield. This shop, apparently constructed of galvanized iron siding and top and enclosed on three sides, is approximately 144 feet long, north and south, by 50 feet in width. The east side, which was regarded as the front of the shop, is open except for a metal siding some 32 feet in length located about midway of the building. Shortly after plaintiff arrived at the shop the defendant appeared on the scene, immediately began to upbraid the plaintiff for having left his truck, became angry and used certain offensive and opprobrious terms in addressing plaintiff, if not actually insulting and cursing him as was testified by plaintiff and other witnesses. Unquestionably, plaintiff was severely reprimanded by the defendant, and, additionally, the latter became seriously offended by plaintiff’s responses of “Yeah” and “O. K.”; demanding that he use the terms “Yes, sir” *153 •and “No, sir.” Defendant’s anger was of such a degree that he immediately discharged plaintiff from his employment and ordered him to leave the premises. Following this difficulty, defendant walked out of the shop to his car, which was parked, headed north, at a point at or beyond the north end •of the above described east side wall, opened the left-hand front door of the car, procured a 38 Smith & Wesson revolver, either from the dash compartment or the front seat of the car, turned back to the south, walked to a position near the rear of his ■car, ordered plaintiff to “get out of there” or “get out here” and fired one shot at plaintiff, which took effect in the left inguinal region of the body, resulting in a massive retroperitoneal hemorrhage, necessitating extensive and serious abdominal surgical procedure and causing the damages for which he seeks reparation. At the time of the above described incident a pickup truck, belonging to one Reynolds, employed as defendant’s shop foreman, was parked at the extreme south end of the east side partition, headed into the said partition. After defendant’s departure from the building, plaintiff walked out of the opening to the south of the partition and along the south side of the Reynolds truck, which vehicle, therefore, was between the respective positions of the parties. It was while in this location that plaintiff was ordered to “get out of there” or “get out here”, whereupon he walked out from behind the truck, saw the weapon in Matthews’ hand and began to plead with him that there was no necessity for any trouble, despite which Matthews fired one shot and plaintiff fell to the ground at the rear of the Reynolds’ truck, where he lay for some period in agonizing pain. Following the shooting Matthews instructed his foreman, Reynolds, to call the office, which maintained a two-way radio, and request Dr. Segura of Mansfield to come out and attend the injured plaintiff. The doctor could not be contacted and after some IS or 20 minutes the plaintiff was placed in Matthews’ car for the purpose of being transported to Mansfield. At a distance of only some 100 yards or so from the premises Matthews met Dr. Segura, plaintiff was taken to the Mansfield Clinic and later transported by ambulance to the Veterans Administration Hospital at Shreveport, where an extensive laparotomy was performed by Dr. King, the chief surgeon, late that night. The testimony of all witnesses, both on behalf of plaintiff and defendant, conclusively establishes the fact that never at any time was plaintiff armed with any sort of weapon: gun, knife, or other dangerous instrument. As above noted, it is the contention of defendant that he was placed in great fear of bodily harm by the aggressive actions of plaintiff. In this connection defendant’s counsel emphasizes the disparity in physical size of the parties involved; plaintiff,- as above noted, being 29 years of age, about 6 feet 2 inches in height, and defendant being 45 years of age and about 5 feet 6 inches in height. The only other fact which we deem material is that at the moment defendant fired on plaintiff the parties were separated by a distance variously estimated at from 8 to 20 feet, and it should be reiterated that at this time defendant had advanced in the direction of plaintiff and was standing in plain view with a pistol in his hand, while plaintiff was unarmed.
The record of trial in this case is made up on behalf of plaintiff by his own testimony and the testimony, by depositon, of one Alfred A. McBride, who at the time of the shooting incident was in the employ of defendant and working on a truck in the repair shop. This witness testified that he quit his employment the following morning because he had no stomach for the nature of occurrence which had taken place the previous day. McBride had removed his residence from Mansfield, Louisiana, to Marshall, Texas, where he had since been engaged in self employed construction work. .
There is no question that counsel for plaintiff in this case was seriously hampered in his effort to obtain information from the alleged witnesses to the shooting incident; *154 a young attorney associated with him attempted to interveiw some of the witnesses who arbitrarily refused to discuss the matter with him and referred him to their employer, the defendant; two professional investigators, retained by counsel for plaintiff also attempted to interview employees of the defendant who were witnesses to the occurrence, and defendant procured their arrest on charges of trespassing.
The testimony on behalf of defendant, as given on trial, in addition to his own, consisted of that of four of his white employees, who testified that they saw and heard some or all of the details in connection with the difficulty between plaintiff and defendant.
The testimony of defendant’s witnesses is replete with discrepancies and contradictions with respect to certain material facts. These differences were explained or excused in the written opinion of the district judge on the reasonable ground that parties to any accident almost inevitably observe the incidents in connection therewith from different points of view. However, we cannot concur in this dismissal of those substantial differences which cannot be satisfactorily explained on the basis assigned. For example, none of the witnesses testified to the identical manner of conduct of plaintiff or defendant in the beginning of the difficulty and none of their versions coincided with the testimony of defendant himself. This circumstance cannot be adequately accounted for by reason of a difference in the point of view. Additionally, it is inconceivable that these witnesses, and some six additional employees of defendant who' were present in the shop at the time, without intervention or attempt to give assistance, would have permitted their employer to' be threatened or victimized in any manner by the aggressive and menacing actions of a burly Negro. Finally, we think it is beyond reason, or even imagination, to accept the testimony of these witnesses as to the fact that they had not even so much as discussed the incident since its occurrence, either with their employer or one another. In this connection, the record contains several posed photographs taken at the request of defendant and his counsel some two months, more or less, after the shooting in which the defendant and several of the employees, who testified on trial, participated. These photographs were designed to show the respective positions of plaintiff and defendant at the beginning and during their alleged altercation, as well as the location of the Matthews and Reynolds cars outside of the building. It is not only improbable but impossible to believe that this could have been done without discussion of the matter.
In dealing with his findings as to the beginning of the difficulty, it is to be observed that the written opinion of the district judge carefully couched his analysis in terms of probability; for example:
"It may be that the reprimand administered to the plaintiff by the defendant in the shop aroused the resentment and anger of the plaintiff so that the plaintiff retaliated by speaking disrespectfully to the defendant and possibly committing some overt act that demonstrated hostility towards the defendant. The defendant then reacted by becoming angry and antagonistic toward the plaintiff. However, this verbal affray did not result in a physical encounter, or assault in the shop.” (Emphasis supplied)
The district judge then concluded that the original altercation between the parties litigant, which had occurred inside of the shop, had terminated. However, he found that after Matthews left the shop he was followed by the plaintiff, who advanced upon him in a threatening manner, wherefore it was concluded that defendant was justified in shooting the plaintiff. It is with this latter conclusion that we emphatically disagree.
The testimony of defendant’s witnesses, upon which the above conclusion is predicat *155 •ed, is again subject to certain material discrepancies which, in our opinion, substantially diminish, if not entirely destroy, the value thereof.
To the contrary, we attach considerable ■significance to the deposition of McBride, who was no longer employed by nor had any relationship with defendant, and who had expressed his fear of returning to Mansfield for the purpose of testifying in person unless guaranteed protection against the ■possibility of violence. The testimony of this witness was substantially corroborative of that of the plaintiff with respect to the material and pertinent actions of the parties litigant.
Needless to say, the testimony of plaintiff and defendant presents an irreconcilable conflict.
Without burdening this opinion with further detailed discussion of the testimony of other witnesses, we think the conclusion which we have reached is amply sustained by the following direct quotations, primarily from the testimony of defendant himself.
Matthews testified on direct examination:
“Q. All right. Now, on the date of this accident, alleged shooting, on July 9th, state to the Court what you did that day inside the shop. What happened between you and Cleavon Barrett?
“A. Well, the nigger come in from having the wreck out there and I got after him about it.
“Q. What did he say when you got after him ?
“A. Well, the first thing he said, he said ‘Yeah’ to me and I told him ‘Nigger, don’t say “yeah”, say “Yes, sir” or “No, sir”, and that’s when he said, ‘O. K.’ and I told him, ‘Don’t say that, either’ and that is when he run up in my face with his hand kind of behind his head. I didn’t know what he had in his hand. So I just immediately started backing out and told him he was fired, to leave the job, get out.”
On cross examination defendant testified:
“Q. Do you always carry a gun in your car?
“A. Yes, sir.
“Q. What do you carry it for, Mr. Matthews ?
‘‘A. I have carried a gun all my life.
“Q. Is it for protection?
“A. Well, you might call it that.
“Q. Mr. Matthews, isn’t it a fact that you went to that — that this Negro didn’t run like he should have run, or did not humble himself as much as you thought he should have humbled himself, and you actually went to get the gun to make him get off of your premises?
“A. No, sir.
“Q. That is not what you went for the gun for?
“A. I didn’t go to the — I started to the car to leave, and if the damn nigger had left I’d have went on to the office.
“Q. Are you testifying that you were scared of the Negro?
“A. No, I am not testifying that I am scared of him, but I am not going to let a nigger — any kind of nigger hit me.
“Q. What did you do when the Negro put his hand behind his head? I want to know exactly what you did.
“A. I backed up.
“Q. In other words, he bluffed you off and then you went on out?
“A. Well, if that is what you want to call it.
“Q. Without saying anything at all to any of these — You had ten men in there, didn’t you?
“A. Yes, I had ten men in there.
*156 “Q. Aren’t those men loyal to yon? Men that would help you if you asked them to help you?
“A. They probably would.
“Q. Sir?
“A. They probably would.
“Q. They probably would have helped you ?
“A. Yes.
“Q. .Wouldn’t they have helped you put the Negro out of there if he was still trespassing and misbehaving ?
“A. They might have.
“Q. But you did not ask them?
“A. I didn’t ask them.
“Q. Mr. Matthews, isn’t it a fact that you were simply angry because the Negro had ‘O.K.’d’ you a couple of times ? Isn’t it a fact that you, like many white people, and like me, would prefer to be said ‘Yes, sir’ to, rather than ‘O.K.’?
“A. Well, I will put it this way: I don’t know whether I would be like you or not, but I don’t want a nigger to say ‘Yes’ and ‘No’ to me. I might not be like you.
“Q. You don’t want him to say ‘Yes’ and ‘No’ and you don’t want him to say ‘O.K.’, either?
“A. No, I don’t.
“Q. Isn’t that the thing that angered you, the fact that he did not say ‘Yes, sir’ and ‘No, sir’ ?
“A. Well, I was a little bit mad, yes.
“Q. You were angry?
“A. Yes, sir.
“Q. You went to your car angry, isn’t that right ?
“A. I went to the car to leave. I don’t want to kill anybody; I never have killed anybody, don’t intend to start it now, unless somebody keeps pushing me.
“Q. You have beaten quite a few Negroes, though, haven’t you?
“A. Yes, sir, I sure have.
“Q. You have beaten quite a few?
“A. Yes, sir.”
And further on cross examination:
“Q. How could you tell that he was following you, Mr. Matthews, if you just saw him walk around the end of the vehicle, the southeast corner of the vehicle?
“A. Well, you know when you think you are going to have — somebody is going to beat you up, you kind of keep your eye on him, don’t you ?
“Q. Yes, sir, I do.
“A. I think it would be a good idea. But that nigger was following me and I was watching out of the back of my eyes. You know, I work about three hundred (300) niggers, and I know pretty well how to handle the biggest part of the niggers. I don’t have any trouble, very much, with them.”
The only other witness produced on trial was tendered on behalf of plaintiff in rebuttal. This witness was not present at the time of the occurrence of the trouble and his only pertinent testimony was to the effect that he was present in the shop on the day before the case was originally set for trial in October, 1960, and heard the defendant, Mr. Matthews, tell the group of his employees there present that “ * * * if they went to court and stuck him they might as well look for a new job.”
It was brought out on cross examination that this witness was no longer employed by defendant and had asserted a compensation claim against him. In his opinion the district judge summarily disposed of the testimony of this witness on the ground that *157 his demeanor was such that he had not given any weight thereto. With this conclusion we take no issue, particularly since we have given no consideration thereto in connection with the formation of our conclusion.
Nevertheless, we think it pertinent to observe that the testimony of the defendant’s witnesses should be considered with the utmost caution in view of the employer-employee relationship, and by further reason of the fact, as above stated, that those who were contacted by representatives of plaintiff refused, either of their own volition or under compulsion or instruction, to discuss the facts of the case.
Even accepting the validity of the testimony of all of the witnesses on trial of the case, we are completely convinced that defendant has failed to establish the slightest excuse, much less justification, for the necessity of his act in shooting plaintiff. On the contrary, we are firmly impressed with the conviction that the shooting was wilful, intentional, unnecessary, unjustified, inexcusable and that the act was performed in the heat of anger, under circumstances to which the plaintiff had not contributed by his attitude, demeanor or conduct. The indisputable facts are that if defendant had been in the slightest fear of physical violence, which, parenthetically, we do not believe to have been the case, he could have called for assistance from any necessary number of his employees, and it is only reasonable to conclude that such assistance would have been forthcoming sufficient in nature and degree to have prevented any physical assault upon defendant by the plaintiff. Additionally, it must be noted that if defendant was insistent upon plaintiff immediately leaving his premises, contact could have been made with the Sheriff’s office through the two-way radio system maintained in defendant’s office, and the result could have been accomplished by properly constituted law enforcement officials.
Finally, we think it utterly inconceivable that plaintiff, after being ordered from behind the Reynolds truck and being completely unarmed, would “advance” upon the angry defendant, standing with a pistol in his hand, obviously prepared, ready and willing to shoot the plaintiff. Such a conclusion would necessitate the finding that plaintiff was either bereft of his senses or deliberately inviting his own death or serious injury, neither of which conclusions are justified in the slightest degree under the testimony contained in the record before us. It was plaintiff’s testimony that he did not “follow” Matthews from the shop, but, after stopping to get a drink of water, left the shop by the south entrance, walking along the side of the Reynolds truck en route to his own car, which was parked near the commissary located on the premises some distance northeasterly from this position. We are firmly convinced that the true reason for the shooting is demonstrated in the testimony of defendant’s shop foreman, Mr. Reynolds, on cross examination:
“Q. Isn’t it a fact, Mr. Reynolds, that what Mr. Matthews shot this Negro about was because he just wasn’t as humble as Mr. Matthews wanted him to be?
“A. Well, that’s right.”
In view of the above findings it is necessary that we next proceed to fix the quantum of damages to which plaintiff is entitled.
The operation performed on plaintiff at the Veterans Administration Hospital in Shreveport the night following the shooting, was designated as an exploratory lapar-otomy, lasting for some two hours fifteen minutes, designed for the purpose of determining the extent of the damage inflicted by the gunshot wound, preventing complications therefrom and specifically relieving the retroperitoneal hemorrhage. The bullet was not removed during this operation and remains imbedded in the musculatory structure of plaintiff’s anatomy. It was the uncontradicted testimony of plaintiff, on trial some 17 months following the accident, that he had been unable to work for a period of a year, more or less, and that, *158 while he had recovered at the time of trial sufficiently to drive a truck, did not believe he was able to perform all of the services which he had rendered in connection with his employment by defendant, in other words, that he continued to be limited as to his ability to perform heavy manual labor. It was also the uncontradicted testimony of plaintiff that his wages while in the employment of defendant averaged approximately $60.00 per week. It is true that the testimony of the physician, who began attending plaintiff a few days following his operation and continued this supervision for the total period of some 12 days plaintiff remained in the Veterans Hospital, discloses that plaintiff had enjoyed what is described in medical terms as an uneventful recovery and the prognosis of this witness indicated the opinion that his patient should have experienced such recovery as to permit his return to manual labor within a period of two months. However, the doctor testified that this estimated period could have been extended by complications. The plaintiff testified that he still experienced an area of numbness of the left anterior thigh and knee, and the doctor conceded that such a complaint was reasonable and could have been caused by the cutting, in the course of the operation, of a nerve furnishing sensory perception in this area. In any ■event, as we have above stated, the testimony of plaintiff as to the extent and duration of his disability remains uncontrovert-■ed.
By reason of the paucity of evidence bearing upon the nature, degree and extent of plaintiff’s injury, we have experienced some difficulty in fixing the quantum of damages in the instant case, but, upon the basis of the record as it exists, we think plaintiff is entitled to an award of $3,000.-■00, representing loss of wages; medical expenses in the total sum of $292.64, established by exhibits introduced in evidence, and an additional allowance in the amount of $3,000.00, which we deem to be reasonable by way of compensation for pain and suffering.
For the reasons assigned the judgment appealed from is annulled and set aside and IT IS NOW ORDERED, ADJUDGED AND DECREED that there be judgment in favor of plaintiff, Cleavon Barrett, and against the defendant, Frank Matthews, in the full sum of $6,292.64, together with all costs.