344 So.2d 1099 (1977)
John Ray OGDEN, Plaintiff and Appellant,
v.
Charley W. SMITH, Defendant and Appellee.
No. 5859.
Court of Appeal of Louisiana, Third Circuit.
April 13, 1977.
*1100 Stephen E. Everett, Alexandria, for defendant and appellee.
Griffing & Scott by George Griffing, Jonesville, for plaintiff and appellant.
Before CULPEPPER, WATSON and STOKER, JJ.
STOKER, Judge.
This appeal arises out of a tort action for personal injury damages. Charley W. Smith, defendant-appellee, used a shotgun and shot and injured Patsy Brown and John Ray Ogden. A companion suit was filed by Patsy Brown (now Ogden) and the two suits were consolidated for trial and appeal. We are rendering judgment in the companion case on this date. See Patsy Brown v. Charley W. Smith, 344 So.2d 1109. The defense to the suit is that Charley W. Smith acted reasonably in the belief that he was justified in shooting plaintiffs-appellants because they were attacking his daughter, Wanda Smith Ogden, and her life was in imminent danger. Wanda Smith Ogden was the estranged wife of John Ray Ogden, and, therefore, Charley W. Smith had been the father-in-law to John Ray Ogden. The trial court gave written reasons for judgment in which he rejected the demands of John Ray Ogden and Patsy Brown, rejected a reconventional demand of Charley W. Smith against John Ray Ogden and cast plaintiff-appellants for all costs in both suits including the costs of the reconventional demand.
As we view the case it involves, not only the reasonable belief of Charley W. Smith, but the question of whether he was justified in using the force employed in the manner he did. In short, was the force used excessive?
No brief was filed in this court on behalf of defendant-appellee, Charley W. Smith. We have carefully reviewed the testimony and all events and statements made by the witnesses and parties, occurring both before and after the shooting. With due deference to the findings and application of law made by the trial judge, we feel that we must reverse.
We set forth here in its entirety the reasons for judgment given by the trial court. They read as follows:

OPINION
This case was tried by this Court on March 4, 1976, and was taken under advisement. The Plaintiffs, PATSY BROWN (Suit 11,358) and JOHN RAY OGDEN (Suit 11,359), seek damages as a result of a shooting which happened on August 19, 1973, at the residence of the Defendant, CHARLEY W. SMITH, in the Sandy Lake community, Catahoula Parish, Louisiana. It appears that after CHARLEY W. SMITH, and his family (and his daughter, Wanda Smith Ogden and her little child), retired for the night, JOHN RAY OGDEN and PATSY BROWN came by motorcycle to the mobile home of Wanda Smith Ogden located on land of Defendant. The reason for the visit is disputed but in any event, the evidence bears out that Wanda Smith Ogden was in her night clothes and was awakened. She went outside to apparently talk to her estranged husband, JOHN RAY OGDEN, and apparently became greatly incensed that he had come to her house trailer located on lands of her father in the company of another woman, PATSY BROWN. This meeting led to an altercation and the granddaughter, (Wanda Smith Ogden's daughter), ran to the residence of CHARLEY W. SMITH, awoke him and told him words *1101 to this effect, "they are beating up my mother". According to the testimony of the child, Defendant's wife and the Defendant, CHARLEY W. SMITH, he arose, took his shotgun, walked to the front porch and fired two shots thinking that there were two men in the yard fighting his daughter (both Plaintiffs were wearing pants and the Defendant testified that he could not tell that one of them was a woman.) No one disputes the fact that serious injuries were inflicted upon JOHN RAY OGDEN as a result of the shooting.
The question posed for consideration in this Court's opinion turns on what belief that Defendant had when the shots were fired. The Court finds that Defendant was acting in defense of his child (Article 236 of the Louisiana Civil Code). If the Defendant reasonably believed the danger to his daughter was imminent, he had reasonable grounds to do what he did (McCullough, et al. v. McAnelly, La.App., 248 So.2d 7, 1971).
The Court finds as proven the following important facts:
(1) The defendant was a man of small statute. (sic)
(2) JOHN RAY OGDEN, one of the Plaintiffs, was a man of rather large statute. (sic)
(3) The Defendant thought that his daughter, Wanda Smith Ogden, was in physical danger.
(4) The Defendant was awakened from his sleep and the altercation happened late at night.
(5) The Defendant testified that he used a fine shot and did not use a heavier shot (buckshot which was readily available).
(6) That the Plaintiffs had been drinking.
Adding up all of the above factors, the Court finds that the Defendant reasonably believed the danger to his daughter's life was imminent and under the circumstances, he had the right to use the force that he did use on the Plaintiffs. Additionally, the Court finds that certainly the Plaintiffs were contributorily negligent in coming to the residence of Wanda Smith Ogden located on the property of CHARLEY W. SMITH under the influence of alcohol late at night and that their actions contributed to the injuries that they sustained.
The demands of Plaintiff are rejected at their costs. The demands of Defendant are likewise rejected at the cost of Plaintiffs.
The Court directs that Defendant's attorney prepare a Judgment in conformity with this Opinion which shall recite that it is in conformity with this Opinion which Judgment shall be approved as to form by both attorneys and shall be presented to the Court for its signature and notice of Judgment shall be served by the Clerk on Counsel for Plaintiffs and Defendants.

BURDEN OF PROOF
In assault and battery cases a plaintiff has the general burden of proof which any plaintiff has in a tort or damage suit. In addition, there are expressions in the jurisprudence that hold plaintiff has the burden of proof to show defendant was the aggressor, or that his own actions did not constitute a provocation sufficient to justify defendant's conduct. Jackson v. City of Baton Rouge, 286 So.2d 743 (La.App. 1st Cir. 1973) writ refused, 290 So.2d 300 (La. 1974); Jacob v. Laborde, 280 So.2d 621 (La. App. 4th Cir. 1973) and Middleton v. Shaw, 271 So.2d 358 (La.App. 2nd Cir., 1972). However, those cases involved situations where the defendant was himself involved directly and did not purport to act in defense of a third party. Appellee, here, is claiming he was defending his daughter. Here, the trial court has found justification for the shooting in this case under Article 236 of the Louisiana Civil Code. We think the appropriate statement of the burden of proof applicable in this case is to be found in Bauman v. Heausler, 188 So.2d 189 (La. App. 4th Cir. 1966), particularly since it prescribes the burden of proof where Article 236 is invoked, i. e. defense of one's *1102 child. The applicable language is found on page 191 of the opinion and reads as follows:
Counsel for defendant cites LSA-C.C. art. 236, which reads as follows:
"Fathers and mothers may justify themselves in an action begun against them for assault and battery, if they have acted in the defense of the persons of their children."
The defense is based primarily upon the argument of justification under the foregoing codal article in protecting his child. We find no fault with the principle of law upon which this defense is made, but our jurisprudence is abundantly clear that provocation or justification for a battery is a question of fact to be determined in the light of circumstances of each individual case, and the burden of proof is upon the defendant. Rivers v. Brown, 168 So.2d 480 (La.App. 3d Cir. 1964); Barrett v. Matthews, 138 So.2d 151 (La.App. 2d Cir. 1962); Theriot v. Gianelloni, 121 So.2d 275 (La.App. 1st Cir. 1960); Bethley v. Cochrane, 77 So.2d 228 (La.App.Orleans 1955).
It will be noted from this expression of law, that defendant-appellee, Charley W. Smith, bears the burden of proof in this case. In that regard we find that he failed to carry his burden and, further, that he was "his own worst witness."

REVIEW OF FACTS
While the trial court's statement of facts is essentially correct, we do not believe it sets forth the full factual circumstances necessary to resolve the issues and especially to determine the question of whether Charley W. Smith carried the burden of proof imposed upon him as noted above. Therefore, we set forth a more detailed statement of facts as disclosed by the record.
To begin with, we feel it should be noted that at the time this trial took place plaintiff Patsy Brown and plaintiff John Ray Ogden, had become married. The former marriage between John Ray Ogden and the defendant's daughter, Wanda Smith Ogden, had been dissolved. At the time of the incident itself, the marriage between John Ray Ogden and Wanda Smith Ogden had ended if they were not, in fact, legally separated or divorced at that time. As a matter of background, it was clearly established (whether relevant to the facts of this case or not) that John Ray Ogden was considered in the community to be something of a troublemaker and had been involved in numerous arrests for disturbance of the peace.
It also appears that after Wanda Smith Ogden ceased living with her husband, she went to reside with her father and mother. At the time of the shooting in this case Charley W. Smith had permitted his daughter to locate a trailer on his premises near his home. Prior to this time, however, John Ray Ogden had on a number of occasions come to the Smith home and remained quite late at night in discussions with his then estranged wife. There is some suggestion that he was attempting to get his wife to return to him, but whether their discussions had this meritorious objective or were simply a continuation of wranglings within the family is immaterial. The testimony of Charley W. Smith itself indicates that these visits annoyed him considerably. On one occasion he ordered John Ray Ogden not to ever return to his property.
On the night in question, at some late hour, well before midnight according to the plaintiffs and well after according to the other side,[1] John Ray Ogden rode his motorcycle, accompanied by Patsy Brown, to the trailer occupied by his former wife. John Ray Ogden drove off of the highway. How far into the yard in front of the trailer he drove is a matter which is disputed, but that fact is not highly material. The testimony of John Ray Ogden, Patsy Brown and the daughter of the defendant, Wanda Smith Ogden, is all in agreement to the *1103 effect that it was Patsy Brown who came to the door of the trailer and knocked for the purpose of giving Wanda Ogden a key to a vehicle which had belonged to the community existing between her and John Ray Ogden. There is absolutely no dispute about this. According to the testimony of John Ray Ogden and Patsy Brown, the former elected to remain on his motorcycle rather than confront his wife and expose himself to possible difficulty or argument.
Wanda Smith Ogden accepted the key but upon learning that her husband was outside she came outside and engaged in conversation with him and Patsy Brown. There is a conflict in the testimony between plaintiffs-appellants and Wanda Smith Ogden as to why the latter left the trailer. Wanda Smith Ogden claims that she had her former husband under a peace bond and Patsy Brown had stated he wanted to talk to her about lifting the bond and that was the reason that she went outside. Plaintiffs-appellants claim, on the other hand, that Wanda Smith Ogden simply came outside to confront her husband. In any event, she came outside and left the safety of her home without being forced or required to do so.
There is also some dispute as to what took place after she got outside. Harsh words began to flow back and forth. At one point Wanda Smith Ogden took the key from the motorcycle and threw it in a ditch according to plaintiffs-appellants. Patsy Brown was known to Wanda Smith Ogden but they were on good terms. Patsy Brown lived nearby and was a beautician and had worked for the Smith family. Nevertheless some harsh words took place between the two women and a scuffle started. At this point the ten year old daughter of Wanda Smith Ogden came into the picture. Her name is Paula McClure and she is a daughter by a former marriage of Mrs. Ogden. She observed what took place from a window in the trailer and saw her mother and Patsy Brown fighting. Then she saw her mother go down to the ground. According to her testimony she sneaked between the cars in front of the three persons and went next door and awakened her grandfather, the defendant-appellee. She said to him "Papa, papa, Sonny (John Ray Ogden) and them is killing my mama". She did not indicate to her grandfather that it was Patsy Brown. Patsy Brown was dressed in shorts and was wearing a helmet. Under the circumstances anyone viewing her without knowing who she was could easily assume that she was a male as defendant-appellee later testified he assumed she was.
Paula McClure candidly admitted that she never saw her stepfather, whom she referred to as Sonny, do anything to her mother. She also admitted that her mother and Patsy Brown had been friends and she knew of no reason why Patsy Brown would want to hurt her. In fact, the best evidence is that John Ray Ogden never got off of the seat of his motorcycle.
When questioned about whether or not Paula McClure saw Patsy Brown do anything to her mother the questioning went as follows: (Tr. 181)
"Q. Did you see Patsy do anything to your mother?
A. Yes.
Q. What did you see her do?
A. When I seen my mama fall, I knew then that mama had kind of probably got mad, then it would be a fight. Then I knew they would both get into a fight. I seen mama pulling the helmet off of Patsy, and Patsy grabbing her and everything. I thought that they might would kill each other.
Q. Now, you saw your mother fall. Did you see your mother get back up?
A. Yes, sir, when she did she went to Patsy.
Q. And did you see your mother jump on Patsy?
A. Yes.
Q. And did you see Patsy grab your mother?
A. Yes, sir, like this. She didn't grab her like that. She grabbed her around.

*1104 Q. What else did you see? Is that all you saw?
A. I saw Sonny kept his hands in his pockets, that's why I was scared. That's why I was afraid he would kill my mama.
Q. But what you're telling us that you saw is all that you saw?
A. Yes, sir, that's all I seen."
The remarks about Sonny keeping his hands in the pockets, has reference to other testimony that he kept his hands in his pockets on previous occasions and there was some speculation that he might have a pistol or weapon in his pocket but no proof of this was ever shown.
In the testimony of defendant-appellee he traced the history of John Ray Ogden coming to his house talking to his daughter. He asked his daughter if there was any possibility of a reconciliation and she assured him that she would not go back to him "to save my life". He then indicated that if that was the way she wanted it then "All right". However, on another occasion the son-in-law did come. Mr. Smith testified as follows:
So, that night he come there and kept me up to 5:00 o'clock that morning, well I couldn't get to sleep then. I had to get up then. What I mean, I had to go to work. My wife stated there that I went to work at 7:00, but I go to work at 7:30, and get off at 4:00. Alright, that night he come there and I got up out of my chair, he was sitting on the couch, him and Wanda, Wanda was sitting right beside of him, I said, "Sonny, now I want you to listen to me very carefully. When you walk out that gate tonight don't put your foot back on my property, no where else around here." He never said a word. When he got up and left that was it. (Emphasis supplied)
Apparently Mr. Ogden did return on occasions but in order not to force the issue Mr. Smith remained in his bedroom attempting to sleep. He testified that on one occasion Ogden came to the door with someone else and knocked and that he ignored them and they left. Then he testified as follows:
"A. So, they finally left. So now you listen to me very carefully every one of you. (Apparently the witness was addressing everyone in the courtroom) I caught all my kids gone, everyone of them, and I told my wife, sitting on the couch, I said "Mama, there's something got to be done about this. I can't stay awake and keep my job and work, all night. Something's got to be done." I didn't say what. Don't misunderstand me that I made no threats and he never made any. (Emphasis supplied)
Q. When was this?
A. Right before the shooting now."
Then he further testified.
"A. * * * This night that this grandbaby came through the house into my room, and grabbed me . . .
Q. And you were asleep?
A. I was asleep. I couldn't hear nothing outside the houseoutside of the fence, you see.
Q. What time of night was this?
A. That was 11:00 o'clock, between 11:00 and 11:30. And I just reached and got this gun, but before this, I want you to listen to me carefully, I got one shell laying on the little light table by my bed, one shell laying there, two in the magazine. The gun won't held but three; one in the barrel and two in the magazine. I got this shell here, when I got middleways of the bedroom I shifted one in the barrel.
Q. What did your granddaughter say to you when she . . .
A. She said, "Papa, don't kill mama. Don't shoot mama."
But the time he got out to his front porch he had loaded the gun with number six shells, squirrel shot, light load, short brass. He walked out on his front porch and walked to the top doorstep. His testimony then was as follows:

*1105 "A. * * * I was standing on the top doorstep. I hollered twice, no answer. I shot one time that way, no answer. Well, when Wanda fell backwards I seen this little man start towards her. I said, "Well, I just as well to stop him before he gets any further." He was going toward the trailer. I didn't hear nothing. So, when he turned and looked around I shot again from here down, and down he went right there, and everything just vanished. And Wanda said, "Daddy, don't shoot no more." Well, I couldn't shoot no more, three shells."
This testimony is directly contradicted by that given by his daughter, Wanda Smith Ogden. Her testimony was that she was standing between Patsy Brown and John Ray Ogden.
The testimony of Wanda Smith Ogden makes it quite clear that her father had become totally exasperated with the nightly visits of John Ray Ogden and he had ordered him not to come anymore. The testimony of Wanda Smith Ogden makes it clear that she was as much a cause of the fight as anyone.
In a portion of her testimony the questioning and testimony went as follows:
"Q. And after ascertaining that it was Patsy Brown you opened the door and wanted to know what she wanted?
A. Yes, I did.
Q. And then when you found out that John Ogden was there, you went out, isn't that right?
A. Yes, I did.
Q. You weren't afraid to go out?
A. In a way, but I was mad.
Q. You went ahead though?
A. Yes, I did."
She was asked to describe to the court exactly what had happened after she got outside.
"A. Well, I was standing at the motorcycle, John was sitting on the motorcycle. They kept on and on and on, and I got mad. (She was apparently referring to attempts to get her to drop charges against Ogden that he was under peace bond for). I think he laid the sunshades laying across the motorcycle. I got mad and grabbed the sunshades and the keys and throwed them down. I think I throwed the sunshades down. No, I didn't. I throwed themyes, I did. I throwed the sunshades down. She started over there where I was at and she pushed me down on the ground. When I got up I jumped on her.
Q. Then what happened?
A. I grabbed the motorcycle helmet she had on and tried to pull it off, but I couldn't get it off. She grabbed my arm in an arm lock. She said, `Wanda, I'm not going to fight you.' She started back over to the motorcycle and we were still arguing. And daddy come out on the porch. He said `What are you all doing out there?' Nobody never said a word, then he shot.
Q. How many times did he shoot?
A. He shot Sonny and then he shot Patsy. Sonny fell off the motorcycle and then Patsy fell down. I looked around and I said `Daddy, stop.'"
In several places in her testimony Mrs. Ogden made it clear that John Ogden never made any move whatsoever to hurt her and that the fight or scuffle was entirely between her and Patsy Brown. It is clear, however, that after Patsy Brown pushed her down that Wanda Ogden got up and the scuffle continued. She testified that when she heard her father shout none of them paid any attention to him. She claims that she told her father not to shoot after the second shot. Her testimony at this point was as follows:
"Q. You didn't holler after the first shot?
A. No, I didn't. It scared me.
Q. What happened on the first shot?
A. Sonny fell off the motorcycle.

*1106 Q. Where were you standing when Sonny fell off the motorcycle?
A. Right by the motorcycle, right in front of him.

Q. Right in front of him?
A. Yes.
Q. The shot could have just as easily have hit you as . . .
A. If it had glancedhit the motorcycle and glanced, yes, I would have got shot.
Q. How far away was Patsy?
A. She was standing right beside me.
Q. So, all three of you were together?
A. All three.
Q. Were you in the middle?
A. I guess you'd say I was in the middle, or close to the middle."
As the testimony extensively quoted above indicates it is clearly at variance with that given by Wanda Smith Ogden's father. Except for the fact that he hollered before he shot, it is evident that he made absolutely no attempt to discover what was going on. Apparently there was some light outside but it was not one of the lights common in open rural areas that light up the entire area, but was a common ordinary incandescent light (TR 166). The wife of Charley W. Smith also testified that all three of the parties at the motorcycle were standing up together. However, she did say that it looked as though they were fighting. She did not recognize anyone and all that she had to go by was what her granddaughter, Paula, had stated to her grandfather.
Everyone who testified in the case, including Wanda Smith Ogden, Mr. Smith and the mother, Mrs. Smith, testified that no threats had ever been made by John Ray Ogden against his former wife or anyone else. On Cross Examination, Mr. Smith testified as follows:
"Q. Isn't it a fact that you told the investigative officer, Clyde Walker, that you shot because you were just tired of if and wanted to put a stop to it?
A. That's exactly right because I had to do something. I had to get some sleep because I was depending on that job for my living."
Deputy Walker testified and gave testimony as follows: (TR 77):
"A. Deputy Walker, when you questioned Mr. Smith what did he tell you?
A. The best I can remember he told me he was just tired of fooling with them.
Q. Tired of fooling with who?
A. Johnny Ray.
Q. Johnny Ray and who else?
A. It was a family deal, and he was just worn out with the trouble they were having."
In questioning Mr. Smith at another point (TR 199), he testified as follows:
"Q. You figured if you were going to shoot somebody that would be a good way to get some sleep?
A. No, no, I don't figure it like that now. (Emphasis supplied)
Q. Well, isn't that what you did?
A. That's what I did, but I don't figure like that. I put a stop to this where he was coming to my house keeping me awake at night, 1:00 and 2:00 o'clock and 3:00 o'clock and 5:00 o'clock in the morning. (Emphasis supplied)
Q. And this is what you told Clyde Walker was the reason you shot, isn't that right?
A. That's right."
Mr. Smith testified he fired his shotgun at a distance of 114 feet from the place where the three parties were standing.

FINDINGS OF FACT BY THIS COURT
We can presume justifiable concern, even alarm, from the action of Paula McClure awakening her grandfather and blurting out the statement that "Sonny and them are trying to kill mama." Even though there had been no threats, it is clear that Johnny Ray Ogden had frequently physically assaulted his former wife during marriage *1107 and such action may have been the cause of the breakup of the marriage. Nevertheless, defendant-appellee in our estimation was not motivated by real fear for the safety of his daughter. In fact, he is either an exceptionally good shot or was extremely lucky. Otherwise, his own daughter should have received a hit from one of the shots fired in her direction. Had he investigated he would have found that his daughter was in no danger. John Ray Ogden was not even a participant in the scuffle. Mr. Smith was at some distance from the parties when he shot114 feet by his own statement. Assuming that his warning shout was not answered and assuming that he fired a warning shot, it is clear that he soon seized the opportunity to shoot and he obviously shot to hit.
In an effort to be completely fair with defendant-appellee, and mindful that the trial court concluded the shooting was justified, we have endeavored to place ourselves in Mr. Smith's shoes at the moment he fired his shots. With due respect to the decision of the trial court, we conclude it was manifestly in error. The evidence strongly preponderates in favor of the conclusion that Mr. Charley W. Smith shot out of sheer exasperation and in an effort to discourage his son-in-law from again coming near his premises. Even, if Mr. Smith was not motivated solely by his ill feelings toward John Ray Ogden, we feel that he used excessive force under the circumstances. In his reasons for judgment the trial court drew attention to the fact that Charley W. Smith had buck shot available but used fine shot instead. The answer to that is that Smith may not have intended to kill anyone, but he did severely wound two people and John Ray Ogden has lost the sight of an eye as a result. We cannot conclude that he acted reasonably in shooting from a distance into a group of three people as he did. We do not feel that defendant-appellee has carried the burden of proof imposed upon him as stated in Bauman v. Heausler, supra.
The trial court relied upon the case of McCullough v. McAnelly, 248 So.2d 7 (La. App. 1st Cir. 1971). As all the cases in this area point out, each case must be decided on its own peculiar facts and circumstances. The McCullough case itself refers to this general rule. We believe the facts and circumstances of that case are distinguishable from those before us.

CONTRIBUTORY NEGLIGENCE OF CLAIMANTS
Finally we must deal with the finding of the trial court's holding, as additional reason for the rejection of the claims of John Ray Ogden and Patsy Brown, his finding that they were contributorily negligent. He held:
Additionally, the court finds that certainly Plaintiffs were contributorily negligent in coming to the residence of Wanda Smith Ogden located on the property of Charley W. Smith under the influence of alcohol late at night and that their actions contributed to the injuries that they sustained.
There is clear evidence from which it may be concluded that plaintiff-appellants were under the influence of alcohol. Nevertheless, there is no evidence that being under the influence of alcohol played any part in the affair in question. In terms of proximate cause, cause-in-fact, duty-risk inquiry, or any other criteria for determining negligence liability (or contributory negligence excusing liability), we are unable to see where being under the influence of intoxicants had anything to do with what transpired. John Ray Ogden never did anything but sit on his motorcycle. He sent his wife's friend, Patsy Brown, to knock on the door to deliver the keys so as to avoid a confrontation with her at her door. Wanda Smith Ogden did not have to leave her trailer, even if requested to do so.
Nor can we conclude that coming to the trailer "late at night" was negligent. The trial court speaks of "their actions which contributed to their injuries" without detailing or describing them. Therefore, we conclude manifest error was committed in concluding plaintiff-appellants were guilty of contributory negligence barring their recovery *1108 in this case. Accordingly, we reverse the holding of the trial court and hold that Charley W. Smith is responsible in damages to the plaintiffs-appellants.

QUANTUM OF DAMAGES
Having reversed the trial court, we must fix the damages. At the outset we note that the record reveals that the damages sustained far exceed the ability of Charley W. Smith to pay. His counsel asked him "Mr. Smith, for the record here for the Court of Appeals down in Lake Charles, they don't know you and if this case gets down that far, I want to ask you something about your finances. You work for the Highway Department?" Mr. Smith replied that he did work for the Highway Department and had done so for 25 years. He was 59 years old at that time (March 4, 1976). He worked in a gang out of the Highway Barn in Harrisonburg and his take home pay was approximately $230.00 every two weeks. He has no substantial assets. He owns one acre of ground with a twelve-year old house on it for which he paid $7,600.00. Pictures in evidence disclose it is unlikely to have exceptional value. At the time of the trial it had been paid for. Mrs. Smith was employed at a Piggly Wiggly store. She was earning approximately $200.00 every ten days. Other than the house, the Smiths owned an "old truck", 1965 model, and a 1968 Buick. Consequently, we are faced with assessing damages to be paid by a defendant whose combined family income is in the neighborhood of $830.00. Obviously, he cannot fully compensate the plaintiffs for their damages, and in fixing damages in cases of this nature we may consider the ability of the defendant to respond in damages. Urk v. Southern Farm Bureau Casualty Insurance Company, 181 So.2d 69 (La.App. 2nd Cir. 1965), writ refused 248 La. 909, 182 So.2d 661 (1966); Tabb v. Norred, 277 So.2d 223 (La.App. 3rd Cir. 1973) writ refused, 279 So.2d 694 (1973) and Adams v. Ross, 300 So.2d 192 (La.App. 1st Cir. 1974).
We come now to the actual damages suffered by John Ray Ogden and Patsy Brown. While it has no particular bearing on the damages to be assessed, we note that since the shooting incident involved in this case, that Patsy Brown became divorced and Patsy Brown and John Ray Ogden became man and wife.
At the time of the shooting incident involved in this case, John Ray Ogden was 29 years old and was employed as a crane operator for Natchez-Adams Port of Natchez, Mississippi. He had been employed at this work for three years and four months. He was hit in the chest and face and around his neck by the blast of pellets from the shot which first hit him. He testified that he was hit in the feet by the shot which hit him after he fell to the ground. Although he had blood in his eye and could hardly see he was able to get up from the ground and went to seek help. Ultimately, however, he and Patsy Brown were both taken to the Jonesville Hospital.
From the Jonesville Hospital Ogden was transferred to the Jefferson-Davis Hospital in Natchez, Mississippi. There he was operated on by an ophthalmologist, Dr. John Robbins Langlow. Dr. Langlow testified by deposition that a pellet had completely pierced the right eye which he sutured for the moment expecting that traumatic cataract would develop. This did, in fact, develop in short order and Dr. Langlow referred Ogden to Dr. Delmar R. Caldwell in Jackson, Mississippi at the University Medical Center there. Over a period of time Ogden underwent two operations performed by Dr. Caldwell for the removal of cataracts. He was never successful in regaining much sight. Ultimately he suffered a detached retina and was referred to doctors in New Orleans by Dr. Langlow, who in turn referred him to a physician and surgeon in Boston, Massachusetts. In Boston he underwent eye surgery at the Massachusetts Eye and Ear Infirmary and was there for a period of three weeks. His operation was a seven hour operation. The second cataract operation was performed on April 28, 1975. The surgery in Boston was performed sometime thereafter.
*1109 As indicated above Mr. Ogden has completely lost the sight of his right eye although he is still employed as a crane operator. He testified that he received numerous pellets in his body and still suffers from having these pellets in his body. From time to time they surface and he is able to cut them out with a razor blade.
After each episode of surgery in which he suffered consequent pain and discomfort, Ogden was required to remain quiet or hospitalized for a period of five days and in the case of the more extensive operations to curtail his operations for a longer period. However, he testified that he lost no pay as he is under a guaranteed 40-hour salary. When he was unable, after the various surgical procedures were performed, to operate his crane he was permitted to do light duty, such as answering the telephone or reading and checking lumber tickets. On cross examination it appears that Mr. Ogden may perhaps be pursuing a malpractice action against one or more of the doctors, but as we understand the matter his principal complaint is that he was not informed of the chances that he would have in connection with the removal of the cataracts and the possibility that he would actually lose the sight of his eye entirely and that he might have saved some slight vision had he not undergone the cataract operation. Nevertheless, the whole evidence indicates that the probability of his losing his sight in the right eye entirely was the most probable consequence of his eye injury from the very beginning and there was only slight hope that any sight could be retained.
Mr. Ogden is now operating his crane although he testifies that his depth perception has been lost and he has to be extremely careful. He drives an automobile and apparently operates his motorcycle. There is some suggestion that he may at some time require a prosthesis being inserted in his right eye but we do not take that into account in assessing the damages.
Mr. Ogden has suffered a total in special damages of $10,715.70. From the previous account of the ability of the defendant-appellee to respond in damages it is quite obvious that he could not hope to compensate Mr. Ogden for the damages which he has suffered. Without reference to damages sustained by Patsy Brown, were Mr. Smith to be assessed with the special damages incurred by Ogden alone, these damages may very well exceed his total assets. Considering the age of defendant-appellee and the fact that the family income is that contributed not only by him but by his wife, we feel that he should pay the special damages of $10,715.70 and general damages against him should be assessed in the amount of $5,000.00. In fixing the general damages at $5,000.00 we are mindful of the fact that if Mr. Smith were able to pay that these damages might reasonably be fixed at five to ten times that amount. However, we believe that a total of $15,715.70 and the cost of this suit together with what we will assess for Patsy Brown may be within the ability of Mr. Smith to pay.
Accordingly, and for the reasons assigned, the judgment of the district court is reversed and judgment is rendered in favor of plaintiff, John Ray Ogden, and against Charley W. Smith in the sum of $15,715.70, together with legal interest thereon from date of judicial demand until paid, and all costs of this proceeding including the costs of appeal.
REVERSED AND RENDERED.
NOTES
[1] Defendant-appellee, Charley W. Smith, himself testified it was between 11:00 and 11:30 P.M. o'clock.